**UNITED STATES of America, Appellee,**

v.

**Orbry Lenny WILLIAMS, Appellant.**

**No. 83–2272.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 17, 1984.

Decided June 26, 1984.

---

Richard C. Turner, U.S. Atty., Ronald M. Kayser, Asst. U.S. Atty., Des Moines, Iowa, for appellee.

Terry Wright, Des Moines, Iowa, for appellant.

Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Orbry Lenny Williams appeals from his conviction of knowingly and intentionally distributing and possessing with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(B), 846. We affirm.

Based upon information in a Des Moines police officer's affidavit, a state court judge, on the evening of November 2, 1982, issued a warrant to search Williams' house and his Toyota automobile. The warrant was executed that same evening. Officers seized drug paraphernalia and other evidence.

State charges were filed against Williams on November 3, 1982. Williams moved to suppress evidence obtained in the November 2 search. A suppression hearing was held and the motion was denied by the state court judge on February 10, 1983.

On May 25, 1983 a federal grand jury returned an indictment against Williams. Williams moved the District Court[1] as he had the state court to suppress the evidence obtained in the November 2 search. A suppression hearing was held in the District Court during which the state search warrant and the transcript from the state suppression hearing were stipulated into evidence. The District Court denied Williams' motion to suppress.

The state charges against Williams were dismissed in favor of the federal prosecution. The case was tried in the District Court on August 8, 1983. A jury convicted Williams and he was sentenced to two concurrent five-year terms.

Williams argues on appeal that there was not probable cause to issue a warrant to search his house or his car and that police entry of his house prior to the arrival on the scene of the already-issued search warrant violated the Fourth Amendment.

### Probable Cause

In ruling on the probable cause issue in this case, the District Court had before it the state search warrant which was issued on November 2, 1982, and its supporting affidavit. Following a review of information contained in the supporting affidavit, the District Court concluded that there had

---

**1.** The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

been probable cause to issue the search warrant.

*Summary of Information Contained in Affidavit*

On August 11, 1982, undercover officers of the Des Moines Police Department purchased one-fourth ounce of methamphetamine from known felon Raymond Lee Brodene. On August 13, 1982, undercover officers gave Brodene money for another purchase of methamphetamine that they agreed would take place on August 19, 1982. An officer purchased one-fourth pound of methamphetamine from Brodene on August 19, 1982. The transaction took place in Brodene's vehicle. Surveillance officers, as well as the undercover officer making the buy, observed an individual in a yellow 1980 or 1981 Toyota drive up to Brodene's vehicle. That individual gave Brodene methamphetamine in exchange for the money Brodene had received from the undercover officer.

Subsequent to the August 19, 1982 transaction, an informant told police that Brodene and an individual known as Buddy were involved in the supply and sale of methamphetamine.[2] Police also learned from an informant that Orbry L. Williams was known as Buddy and that he lived at 1427 Dean in Des Moines.

Police and public records confirmed that Orbry Lenny Williams was known as Buddy and listed his current address as 1427 Dean. The records further indicated that Williams and his wife owned a 1978 Coachman motor home (Iowa license plate GVK 655) and a yellow 1980 Toyota Corolla (Iowa license plate FOG 958). Additionally, Williams had a felony conviction record.

On September 16, 1982 police conducted a surveillance of Williams' house at 1427 Dean. Officers observed an individual, whom they identified as the same individual they saw driving the yellow Toyota during the August 19, 1982 methamphetamine transaction, drive away from the house in a yellow Toyota (Iowa license plate FOG 958).

Undercover officers had numerous meetings and conversations with Brodene. Brodene revealed that Bud had and was selling controlled substances during the week of October 2 to October 9, 1982. In a meeting with him on October 8, 1982, undercover officers gave Brodene money for another methamphetamine purchase. Brodene told the officers that he was to give this money to Bud and that Bud would order the methamphetamine. Following this meeting, Brodene drove to and entered a house located at 1611 Dean. Meanwhile, officers conducting surveillance at 1427 Dean on October 8, 1982, observed an individual fitting Williams' description drive a 1978 Coachman motor home (Iowa license plate GVK 655) to 1611 Dean and enter the residence. A short time later, this individual left 1611 Dean and drove back to 1427 Dean. Public utility records showed that utilities at 1611 Dean were in the name of Dale Jones. Dale Jones was known to the Des Moines Police Department Narcotics Control Unit as a drug user and seller.

Brodene told undercover officers that the methamphetamine they had discussed on October 8, 1982 would be arriving through his source's post office box at the E–14th and Ovid substation in Des Moines on or about October 13, 1982. According to Brodene, the methamphetamine came from the Tahoe City, California area in quantities up to one-half pound. Brodene described the packages of methamphetamine as being similar in size to a plastic Tupperware sandwich container.

Postal authorities informed police that box 5536 at the E–14th and Ovid substation had been rented by Williams' wife on August 18, 1982. Police also learned from telephone company records that a number of toll phone calls had been placed from Williams' phone at 1427 Dean to the Tahoe City, California area.

On October 15, 1982 a package did arrive at the E–14th and Ovid substation ad-

---

**2.** In several conversations with undercover officers, Brodene referred to his source for meth-amphetamine as Bud.

dressed to Williams' wife, P.O. Box 5536. The package was of the approximate size described by Brodene and weighed eight ounces. The return address on the package was 556 Oak Street, Eugene, Oregon, which proved to be a nonexistent address. Williams signed for and picked up the package at the E–14th and Ovid substation on the morning of October 15, 1982. Williams left the substation with the package and drove (in the yellow 1980 Toyota, Iowa license plate FOG 958) directly to 1427 Dean. On October 19, 1982, Brodene told undercover officers that methamphetamine had arrived on October 15, 1982 but that because Bud was nervous, he had not offered to sell the methamphetamine to him at that time.

Between October 15 and October 29, 1982, Brodene had several more conversations with undercover officers. Brodene mentioned that he would contact the officers because Bud would be getting more methamphetamine that they could buy. On October 29, 1982, Brodene contacted undercover officers, advising them that Bud had received more methamphetamine and that they could buy one-fourth pound. On November 2, 1982, Brodene again contacted undercover officers. Brodene told them that the methamphetamine was available "now," that he would make the arrangements, and that he was afraid his source would sell the methamphetamine to someone else if the officers did not make the purchase that night.

*Analysis*

■ A determination as to the existence of probable cause to issue a search warrant involves "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *see also United States v. Michaels*, 726 F.2d 1307, 1313 (8th Cir.1984). Under this "totality of the circumstances" analysis, it is this Court's duty to insure that there

was a substantial basis for concluding that probable cause existed to issue the warrant in question. *See id.*

The affidavit in this case contained numerous facts implicating Williams in illicit drug transactions. A significant portion of the information in the affidavit is the product of undercover officers' direct dealings with Brodene. For more than two months Brodene consistently had dealt with undercover police officers in a reliable fashion. Information gained through independent police investigation also had corroborated some of Brodene's statements. Furthermore, the affidavit contained additional information gained through independent investigation as well as information that was a matter of public record.

■ Williams nevertheless argues that there was not probable cause to issue the search warrant, contending that information in the affidavit does not establish that on November 2, 1982, the items to be searched for would be found at 1427 Dean or in his 1980 Toyota. This argument is untenable. The affidavit recounted Williams' suspicious behavior from August 19 through November 2, 1982. Moreover, Brodene's statements contained in the affidavit specifically included those that on October 29, 1982, Bud had received methamphetamine and that on November 2, 1982, methamphetamine was available to the undercover officers "now," but that his source would sell it to someone else if the transaction was delayed any further.

The affidavit indicates that Brodene's source, Bud, had methamphetamine in his possession on November 2, 1982. Based on the affidavit, one could assume to a degree of near certainty that Brodene's source, Bud, and Williams are the same person. Thus, the affidavit indicated that Williams had methamphetamine in his possession on November 2, 1982.

The information in the affidavit provided the requisite substantial basis from which one could conclude that there was probable cause to issue a search warrant for Williams' house and his automobile. These were two logical places to look for methamphetamine which the affidavit reasonably

indicated was in Williams' possession on November 2, 1982. The District Court obviously recognized this and we hold that it correctly ruled that the affidavit had established probable cause for issuance of the search warrant.

*Entry and Search of Williams' House*

According to the testimony of police officers, on the evening of November 2, 1982, surveillance was being conducted at Williams' house located at 1427 Dean. Sergeant Gerald Wells was in charge of this surveillance. Wells observed a vehicle stop and let out a passenger near Williams' driveway. Wells could not, however, identify the individual or see where he went. Wells also observed Williams exit his house, get into his car for a few minutes, and re-enter his house. Wells knew that undercover officers simultaneously were making a buy from Brodene and that Williams was suspected as Brodene's source. Wells heard radio communications concerning a twenty-minute, high-speed chase of Brodene by police officers after the buy. The police had information that Brodene was to take the money from the buy to Williams. Wells feared that Williams might have become suspicious about the amount of time it was taking Brodene to return with the money and concluded that Williams might be preparing to leave or that evidence might be destroyed.

Wells knew from radio communications that a search warrant had been issued for Williams' house and his car and that the warrant was en route to 1427 Dean. Wells and several other armed surveillance officers went to the door of Williams' house and knocked. When Williams answered, Wells identified himself as a police officer and told Williams that the house would be searched as soon as the search warrant arrived. The officers entered the house, seated Williams and his wife at a table in the dining area, looked around the adjoining kitchen, and checked part of the house for other occupants. The search warrant was delivered approximately ten minutes after the initial entry of the house. A thorough search of the house then was conducted. The District Court found these

to be the facts concerning the entry and search of Williams' house and we hold that these findings are not clearly erroneous.

Williams claims that the initial entry of his house prior to the arrival of the already-issued search warrant was made absent exigent circumstances and thus was in violation of the Fourth Amendment. Williams therefore argues that all evidence seized under the warrant should have been suppressed. It is the government's position that exigent circumstances did exist which justified the initial entry. Because we decide this case on other grounds, we need not consider whether exigent circumstances existed.

In *United States v. Beck*, 662 F.2d 527 (8th Cir.1981), this Court held that evidence taken from defendants' house during a search conducted pursuant to a valid search warrant need not be suppressed, even though the warrant was not procured until after officers had made a warrantless entry of the house. In *Beck*, an undercover officer arranged to purchase marijuana from Jay Kobelarczyk. The sale was to take place at Kobelarczyk's sources' house. Kobelarczyk met the officer, got into the officer's car, and directed the officer to his sources' house. Back-up officers followed the two to their destination. The officer remained in the car while Kobelarczyk went into the house. Kobelarczyk returned with the marijuana and completed the transaction, after which he was arrested by some of the back-up officers. One officer noticed an individual watching the arrest from an upstairs window of the house. Fearing that persons inside the house thus had been alerted to the presence of the police and that evidence might be destroyed, several officers entered the rear door of the house. One officer went to the front door of the house. The front door was open and an individual was standing in the doorway. Seeing the officer, the individual attempted to close the door. The house was secured by the officers. It was searched once a warrant had been issued, some two hours after the initial entry. *See id.* at 528–29.

The Court in *Beck* was unwilling to say that exigent circumstances existed which

justified the initial entry, but nevertheless upheld the district court's refusal to suppress evidence because nothing "garnered while the agents waited for the search warrant" was used to convict the defendants. *Id.* at 530. Rather, the crucial evidence was uncovered during a search pursuant to a valid search warrant. The Court reasoned that evidence obtained through the execution of a valid warrant need not be suppressed because of a prior illegality. The search was independent of the initial entry; a valid warrant authorizing the search had been issued based upon information gained prior to and independent of the initial entry. *Id.*

■ As in *Beck*, issuance of the search warrant in this case was based only on information gained prior to and independent of the initial entry of the premises in question.[3] Even assuming that the initial entry in this case did violate the Fourth Amendment, under *Beck* one successfully could challenge the admission of only that evidence discovered as a result of the initial entry; evidence that was not discovered until after the valid search warrant was brought to the house need not be suppressed.

Among the items seized from Williams' house and admitted into evidence at trial were two sets of balance scales. The scales were described as typical of those used by drug sellers. Other items included a small case containing plastic bags, Tupperware sandwich containers, syringes, sterile alcohol pads, razor blades, rice, a funnel, a screen, and a small vial. There was testimony that the items found in the case were of a nature consistent with the classification of drug paraphernalia. Methamphetamine residue was found in one syringe. The officers also seized two handwritten documents, which included references to "First Deal" and "Second Deal," and a photograph. An expert witness testified that the documents were written by Williams. Having already identified Williams as the man who delivered methamphetamine to Brodene on August 19, 1982, a police officer further testified that the individual making the August 19, 1982 delivery had a tatoo on his arm identical to the one visible on Williams' arm in the photograph.

■ We have carefully reviewed the record in this case. Of the items discussed above, only the two documents and the photograph could have been seen by the officers who initially entered Williams' house. All the other items were found in the basement, which the record shows was entered and searched only by one of the officers bearing the search warrant. Thus, nearly all of the evidence taken from Williams' house was discovered in the basement after the valid search warrant had arrived on the scene and unquestionably was admissible under *Beck*. Even if the two documents, the photograph, and testimony concerning those three items should have been suppressed, *see United States v. Segura*, 663 F.2d 411 (2d Cir.1982),[4] we hold that failure to do so would constitute harmless error beyond a reasonable doubt. *See United States v. Perez*, 714 F.2d 52, 54 (8th Cir.1983); *cf. United States v. Leichtling*, 684 F.2d 553, 557 (8th Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983) (even if evidence in question was improperly seized, its admission constituted harmless error beyond a reasonable doubt because the evidence was cumulative at best). Evidence including the items seized from Williams' basement,

---

3. But there are differences between this case and *Beck*. There officers entered a house before seeking a warrant, secured the house, and waited for two hours while a search warrant was being procured. In the instant case, a warrant to search Williams' house had been issued prior to the initial entry and was en route. In fact, the warrant was brought to the house only five to ten minutes after the initial entry. Thus the police conduct in this case was considerably less intrusive than that in *Beck*.

4. This was an appeal by the United States from a district court order granting defendants' motion to suppress evidence. The Second Circuit affirmed in part and reversed in part: items discovered after an unlawful entry but before procurement of a valid search warrant should have been suppressed notwithstanding an independent basis for the search warrant; but items discovered after issuance of and pursuant to a valid search warrant should not have been suppressed. *See* 663 F.2d at 416–17 (*Segura I*). The defendants then were tried and convicted. The Second Circuit affirmed the convictions by

another set of scales found in Williams' car pursuant to the valid warrant, as well as the methamphetamine Williams delivered to Brodene during the transaction on August 19, 1982 is more than ample to support this conviction. The two documents and the photograph, together with testimony about them, are cumulative and if their admission was error it was harmless error.

The judgment below is affirmed.

unpublished summary order, *see* 697 F.2d 300 (2d Cir.1983) (*Segura II*), holding that *Segura I* was dispositive of evidentiary challenges raised in *Segura II*. *See* 52 U.S.L.W. 3082 (Aug. 16, 1983).

In a decision issued subsequent to the filing of our opinion in the instant case, the Supreme Court affirmed *Segura II*, agreeing with the Second Circuit that items discovered only pursuant to the valid search warrant were not tainted by the initial entry. *See Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The Second Circuit rulings that the initial entry was illegal and that items discovered after the unlawful entry but prior to issuance of a valid warrant must be suppressed were not presented to the Supreme Court for review. *Id.* at ——, 104 S.Ct. at 3385.